Mr. Viena, please support Alan Bloom appearing on behalf of George Pardo. No one saw Pardo commit the crime. Instead his guilt was established on the basis of his sole custody of the child during times when the injuries likely occurred and reported by the child's mother. Pardo denied commission of the crimes. Those words from learned counsel for Apelli. Mr. Viena framed this case quite appropriately. I don't think there's a whole lot of law that's at issue here. This is truly a review of the facts that were presented at the case and what could have been presented at the case had they been properly fleshed out and presented to the jury. There is no direct evidence, no one who directly saw any of the injuries to the child at all. They occurred at the trial. The jury heard only that they occurred at the time that the child was obtained or received from George Pardo. Circumstantial evidence. Yes, circumstantial evidence can be very compelling and there's nothing wrong with dealing with that. And if the jury only heard that, as I said in here, in one of my points in here, even an ancient practitioner like myself would have, sitting in the jury, would have said this is very, very strong and compelling. But it's not the entire facts of the case. Let's talk about some of the evidence and the facts that you have raised. I guess, how did the counsel's purported failure to call, was it Ms. Rita Slayton? Yes. A prejudice petitioner. When petitioner's defense at trial was that Jane Doe did not have any injuries when Megan picked her up from the petitioner's home and sustained her injuries later. I'm trying to understand how Ms. Slayton would have been significant in any respect there. Okay. I'd like to address that in two separate ways. Number one, the formation of the trial tactic in this case was based upon the fact by Mr. Vandenberg, the trial counsel in this case. It was based upon the fact of the limited knowledge that he had. In other words, he pursued a particular defense because he thought that's all that there was. And he didn't think that's all that there was because he had gone out and investigated the case. He didn't think that that's all that there was because he had reviewed the pictures in the case or reviewed even most of the evidence of the case. He didn't think that's the way it was because he sent his investigator to talk to Rita Slayton who was right there and available. He formed this tactic in the dark. So that's one explanation as to why we got to that point. But now the court is talking about the process of when the injuries occurred. How do we know, Your Honor, how do we know that that is the situation? It's based upon what Ms. Unger said. And Ms. Unger was never challenged with the fact that Rita Slayton or what Ms. Unger said at another time to Rita Slayton, namely that the injuries, Ms. Unger herself observed the injuries after she got the child from Robbie. And the government raised that point, but it's backwards. If you start with the idea that this chain of, I'll call it custody, a chain of care for this child left out this giant gap and that really the injuries were observed after the child was received from Robbie, which is what Ms. Unger told Ms. Slayton and also, by the way, which he told Ms. Deardorff, then the complexion of the case changes enormously. It's a monumental hole. It's a Grand Canyon. But you're arguing that the defendant would not have said that the child was fine when first received by him. He wouldn't know. He doesn't know. He didn't know at the time he was testifying who had been in that chain of custody. He didn't know about a possible defense that would have changed his story. Had he known about that, he would have changed his story. No, no. It's not that he would have changed his story. All he can do is testify about what he was aware of. He was equally unaware of this hole in the case. He was equally unaware. What she testified to is when the child was given to him, he changed the pants and she hadn't had any injury. He's trying to blame the prior custodian. No, I think there's a difference, Your Honor. He's saying that he didn't find any injury in that regard. It wasn't pursued in any way of how much he looked at the child, how deeply he looked at the child. Actually, it was pursued the other way. It was pretty clear from Ms. Unger when she said she saw Mr. Pardot taking care of the child, he paid very perfunctory kind of contact with the kid. He claimed that he changed her pants. He changed her pants. He claimed also that he gave her a bath. He was present at the time the bath was given. What I recall the record as saying is what I reviewed this morning is that Ms. Unger says, and the record reflects that George Pardot's contact with the child was a change of the diapers, a change of the pants, and took off her shirt, at which point he surmised later on maybe that's how this happened. The question is, questions were put to Ms. Unger. How carefully did you look at the child? And she says, I looked at the child well. I spread the child's folds of the vagina. I looked at the child well. There is nothing in the record that Mr. Pardot himself conducted such an observation so quickly. But if his client says there was nothing the matter with that baby, and I saw her in the morning, I kept her for three hours, nothing happened, why would he say somebody had injured the child before he even saw it? He wouldn't know. But why would he miss it I think is the question. I think that's the question. Why would he say it and miss it? I can only say that I don't believe he did the examination of this child in an intense way, the same way, for example, a doctor would. But by the way, can I make a comment on that? The doctor who examined this child also missed those observations? The first doctors who saw this child didn't see the injuries to the child that was finally observed the next morning by the experts, the expert doctors who looked at it? Now, isn't that a powerful indicator that George Pardot, he was 19 or 20 or something at the time, she was 16, there was no evidence at all that he had cared for children before, that he would have missed these particular injuries? The doctor who's trained in emergency room examinations didn't see it? And that's in the record? I don't think the argument can be placed that he, George Pardot, would have changed his story otherwise. He's saying what he saw. It does contradict what we now know or what I believe we now know to be the facts, but I don't see it as disingenuous on his part. Can I ask you another question? Ms. Murgy, I was ready to say something, but I interrupted her. I apologize. Go ahead. Well, this relates to the brief, and in reading over your brief, blue brief at page 40 states that the Deardorff, Ms. Deardorff's statement averves that she was available to be interviewed by defense counsel, but she was never contacted. I've reviewed her declaration. There's nothing in her declaration that says she was available or never contacted. I apologize. If I misstated that and said it as a Slayton instead of Deardorff, I might have said that maybe. Deardorff is the one that I'm looking at. I know. I'll look at that during my time that I'll take in reserve, and I'll see if that's correct, Your Honor. I know Ms. Slayton said that, and you're talking about Deardorff, but I also argue that Ms. Deardorff said it, and I'm not sure that precise point. Hemet is 66,000 people back at that time period. It's a small little island of a community. These people were all available. We found them almost immediately after I came on to the case. We did the investigation that wasn't done in this case. Ms. Deardorff wasn't even contacted, even though that was the only name that the investigator for the case told trial counsel to contact her, but trial counsel never directed them to do so. Judge? I'm just going to dovetail on to Judge Molloy's question because I'm just trying to figure out what your best case is in support of your argument that appears that you made in your brief that we should conclude that the trial counsel did not interview Ms. Deardorff just because there's no evidence of the interview. It seems like our case law says the absence of that kind of evidence can't overcome the strong presumption that counsel's conduct fell within the wide range of reasonable performance, so I was just going to ask you about that. I was informed, and in the record is Mr. Vandenberg's statement that he gave me the entire file in the case. In the record is he has no recollection of conducting an investigation. In the record that the record itself does not show that any investigation ever took place, and in the record is the statement from the investigator advising trial counsel Mr. Vandenberg to do it. So it's not just that it's absent. It's that he states that there's nothing there and that he has also told me that he has provided everything. And Ms. Deardorff, in your, I guess, submission here would have been critical to the outcome? Well, I think Deardorff is, in conjunction with Slayton, Deardorff is confirming both of those situations and very, very powerful. Both of them fill in that huge chasm, that huge grand valley, which is monumentally empty in this case, establishing that, in fact, it was to Robbie that the child was presented and it was after Robbie that the child was seen to be injured. And I didn't get to change any. I hope I have a few moments to reply. Thank you very much. Good morning, Your Honor. May it please the Court. I'm Kevin Viena, California Deputy Attorney General for Respondent and Appellee in this matter. I'm not sure what chasm we're filling in. It seems to me that Ms. Slayton said clearly in her declaration that the injury, or that the time that Robbie had custody of the child was on October 20th. The child goes to the hospital on the 21st. There are a couple of problems with that, that being on October 20th. The first problem is that means that lots of people miss the injury to the child, because on the 21st we had Megan with the child early in the morning. We have Megan's mother with the child shortly after that taking care of her and bathing her. We have Laura Cochario and her friend Heather Miller then with the child, again, before 10 o'clock in the morning. And we have, and then Laura says that she took the child to Megan at her workplace. So it seems impossible, based on the fresh, very fresh, recent injuries described by Dr. Murray, that folks missed this attack on the child. What about the first doctors that was just mentioned right now? Dr. Murray says that the emergency room doctors aren't very well trained in examining sex injuries on small children. But what I would say is that I don't think very much examination took place. That is, the child was brought in, there was the report, and they immediately decided to send the child to the sex abuse examination center at the Riverside Hospital. Is that right? Didn't they first suggest they get a CT scan? The doctor was on the phone, suggested a CT scan. Yes, a full-body scan. One doctor called the other doctor, and then they said, bring her immediately. Yes. But the medical record specifically says that that initial, that there was no observed injuries in the perinatal area. Well, that's what that report says. I don't disagree with that. But what I would say is that Dr. Murray said that the sex injuries were obvious to someone who carefully cleaned the child, and not only were the injuries obvious, but the child's behavior after those injuries would have been obvious as well. Dr. Murray says quite clearly that urination by the child would be painful, and Dr. Murray says that the cleaning of the child with wipes, with diaper wipes, would also have been an indication of pain. And no one sees that before 10 o'clock in the morning. Yes, but all of that medical record, that first medical record says everything is within normal limits, or the child is alert, happy, playing. Well, I think Dr. Murray wasn't examined on that too thoroughly, and I'll check the record because I think she mentions, she responds to a question about the examination there. But she says that the injuries would have been obvious. And there's another injury that would have been obvious, a depressed skull fracture that was still expanding in the afternoon of October 21st. That is, this child has a severe skull fracture. This child has a bloody lip, that bruising that would have been obvious. So even if we have an emergency room doctor who missed something in the vaginal and anal area, the other injuries were obvious. And all of those people said no injuries, all those people said no injuries, and Pardo said repeatedly no injuries. And he also examined the child on multiple occasions. I think he said that he changed her diaper three times, and may have suggested that Megan need not look at the diaper because he had just recently changed her. So we have a defense counsel who is faced with a client who has repeatedly denied that there's been any injury there. Although he has admitted that he lied about some of the injuries, or he lied about some of the events with the child. That is, he was deceptive about the head injuries, only reluctantly saying that he had bumped her head on the bumper of a truck when he bent down to get a milk bottle. And then the next day, saying that he was horsing around with the child, tossing her in the air, and he dropped her. Megan called the father on the way to the hospital, or perhaps on the way to the emergency room or on the way to the pediatricians, and said, what's wrong with my child? What's happened? So we have a young man who's being asked to provide information that might be important for the health care treatment of this child. And he is misleading from the beginning about what happened with that child. So the defense of some other dude did it before Pardo had custody of that child simply could not have been successful. Do we know when the Petitioner's trial counsel learned about someone else, I guess Robby Cario, who purportedly cared for Jane Doe? It's about five years after the crime that Mr. Bloom gets a declaration from Rita Slayton and from Carrie Deardorff. And I would add that if Hemet is this small town island in the middle of California somewhere, so that everyone could easily be found by trial defense counsel, that same island means that Ms. Slayton watched Mr. Pardo go to prison as a convicted child abuser, a serious child abuser, and did nothing about it. Her declaration paints her in a fine light, or she paints herself in one. That is, she's unhappy that Megan did not seek sex abuse counseling from her, but she did nothing for years, what appears to be about three years after the conviction. She is also unreliable in her memory about a couple of other things. Rita Slayton is. Is there any information, or I guess what's your response to the questions regarding Ms. Deardorff and whether or not the counsel interviewed her? I think the district court, the magistrate judge examined that thoroughly and correctly, saying that the record simply doesn't show that she was not interviewed. We don't know. But we also know that she was itinerant. That is, she didn't seem to have a stable lifestyle in Hemet and was gone at the time the crime occurred. Maybe you can address then prejudice with respect to Ms. Deardorff and Ms. Slayton, and I guess your opposing counsel here, Mr. Bloom, was saying that combined that their information would have been. Again, I disagree. Ms. Slayton's adamant testimony that the injuries to this child had to happen on the 20th is completely contradicted by the number of people who had that child in their care, including Mr. Pardo, who denied the existence of any problems with the child until Megan first observes problems with the child later that afternoon. That is, the child's undressed because she spit up. What's spitting up and what's throwing up a symptom of? A skull fracture. There's no indication that she had that problem before the afternoon of October 21st. Dr. Murray says injuries consistent with an attack occurring on the early afternoon of October 21st. Megan's saying when she comes to see the child, the child is bleeding in the mouth. The child has maybe some teething issues but has an obvious injury to her lip as if she's been struck. The child has indications that she has been strangled or choked. No one saw any of this until the afternoon of October 21st. So it could not have been harmful not to have an unreliable Ms. Slayton say that the injury occurred on the 20th, and that Robbie did it. Beyond that, Robbie is a mystery. On the 21st, when his sister has custody of the child with Heather Miller, she says, no one else is there. Contrary to what Slayton says, that is, that Laura Cachario left the child with her brother and that Megan went to get the child. Laura also testified that she had custody of the child on the morning of the 20th, the day before the injuries were reported. No indication that Robbie is around at that time. And further indicating the unreliability of Ms. Slayton's declaration, who says that Megan went from work to get the child. Laura Cachario says that on both days, on the 20th and the 21st, she took the child to Megan's workplace and on the 21st took the child inside to drop her off. Quite simply, the Robbie did it defense could not have been effective, particularly in light of the defendant's statements. Now, the defendant may not have been an experienced child care provider, but the defendant was certainly able to tell if the child had burning and crying and urination. And that never happens. That's never observed by anyone until about 3 or 4 o'clock in the afternoon of the 21st, when Megan sees her in the tub. We're taking you past your time. Thank you, Your Honor. Mr. Bloom, we'll give you a couple of minutes. First of all, I want to agree with Judge Molloy. I misstated in my argument on page 40 that Ms. Derridaur's statement says that she was available. That's Ms. Slayton's statement. That's a misstatement on my behalf. Derridaur was found by us and gave us that full statement. And it's amazing to me that there can be a complaint made that trial counsel did everything he could to find witnesses when not one of these witnesses were ever presented or discovered. We came on to the case, do an investigation, and then we find them. It's been fully briefed as to the background of Mr. Vandenberg as being a good person and a kind person. That's not the issue. It's also been fully briefed as to what he did on this case by his own statement of what he didn't do on this case and how the paucity of his file. But that's been presented to the court for consideration. We found these witnesses. The question is whether or not these witnesses are critical. On two final points, I don't believe the people can have it or the government can have it both ways to say that the injuries were very obvious but that the emergency room doctors missed it because they weren't that obvious. Either they were obvious or they weren't. I would suggest that emergency room physicians and all of the people that create those medical records, which would include nurses and other people who would have contact with the child, are clearly mandated to be looking for injuries to the child. It's their job to look for injuries to the child. They were brought in because of injuries to the child. How to say that they could miss it, and that's understandable, but that a grandmother or a 20-year-old young man who has no child-rearing experience gives a bath or changes a diaper, actually, it's impossible he could have missed it. We don't have to guess. Oh, and one more thing. As to the timing of the injuries, it's been fully briefed, so I'll allow the courts to refresh its recollection, if it would, because I went through fresh versus very fresh the timing of these injuries. When would they be so manifest that nobody would miss them? Could this have occurred on the 20th, the 21st, and not seen until the 22nd? The record is very clear that these injuries can be delayed in how they appear. Can you just remind me? I don't remember. The fact that the ER docs that initially examined the victim here, did that come out during the trial? No. That's the whole point. It never got. Mr. Viena properly argues to the court. There's no reference to that at all. The records are in the file, so the records are available, but the fact that this was entirely missed and this whole presentation wasn't touched on by Mr. Vandenberg at all. He wasn't ready for it. He never thought about it. He had blinders on when he took this case, and he didn't do it. The question is, everybody, Mr. Viena, properly argues that nobody said that Robbie was the person who committed this offense, but that's wrong as to one person. Ms. Unger said that it happened. I picked up the child from Robbie, and that's when I first noticed the problems. All right. Thank you very much, Mr. Bloom. Thank you very much, Your Honor. The case of Bardo v. Sherman is submitted.
judges: Bea, Murguia, Molloy